**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| BARBARA SMITH,<br>　　　　　　Plaintiff,<br><br>v.<br><br>NOVO NORDISK A/S and NOVO NORDISK INC.,<br>　　　　　　Defendants. | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: 2:26-cv-5150 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court.  Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the District of Wyoming as Plaintiff's designated venue ("Original Venue").  Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X  Plaintiff currently resides in Cheyenne, Wyoming (City/State).

X  Plaintiff purchased and used Defendant(s)' products in Cheyenne, Wyoming (City/State).

__ The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X  The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): _____.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is

subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): _____.

## NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiff, who was severely injured as a result of Plaintiff's use of Saxenda, an injectable prescription medication that is used to aid weight loss in adults with obesity or who are overweight and also have at least one weight-related comorbid condition, and children ages 12-17 with obesity and have a body weight above 132 pounds.

2.      Saxenda belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs"). The active ingredient in Saxenda is known as liraglutide. Other drugs and active ingredients detailed below also fall within the GLP-1 RA class, based on similarities in their mechanisms of action, physiologic effects, and chemical structure.

3.      Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, a gut hormone that binds to receptors throughout the body and, notably, activates GLP-1 receptors in the pancreas to stimulate the release of insulin and suppress glucagon.[1]

4.      GLP-1 RAs are designed to work similarly, to stimulate insulin production and reduce glucose production, but engineered to last longer than naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes.

5.      GLP-1 RAs are prescribed, for certain patient populations, to control blood sugar in adults with type 2 diabetes, reduce cardiac risk, and/or aid in chronic weight management.

---

[1] D. Hinnen, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) DIABETES SPECTR. 202-10 (Aug. 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/.

6.     Defendants have failed to provide adequate warnings about adverse events caused by their GLP-1RAs, even serious and devastating effects, including non-arteritic anterior ischemic optic neuropathy ("NAION"), which can result in blindness and permanent vision loss, as well as blurry and/or darkened vision, which may lead to falls and other injuries.

7.     The decision to target the American population for the sale of Defendants' GLP-1RAs was not accidental. Defendants understood the vast financial potential of marketing medications for weight loss in the United States, where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

8.     Defendants set on a course to create and expand the market for weight-loss medication(s) by, among other things, advocating for obesity to be classified as a disease and thereby expanding the market for their drugs, spending hundreds of millions of dollars in an effort to change the medical consensus on how to treat obesity, implementing cutting-edge invasive, unprecedented and multifaceted marketing campaigns that were so effective they engrained these drugs in the pop culture zeitgeist, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance. Defendants engaged in this conduct even before GLP-1 RAs were approved for weight loss, encouraging extensive off-label demand for, and use of, GLP-1 RAs.

9.     By undertaking that effort, Defendants also were systematically and intentionally targeting users of other diabetes medications. Defendants' promise of weight loss wrongfully enticed users of other diabetes medications to switch to a GLP-1 RA who never would have done so had it not been for the off-label promotion of those drugs.

3

10.    Defendants also sought to make the GLP-1 RAs more accessible by, among other things, marketing through telemedicine where the criteria for qualifying for the drugs, *e.g.*, Body Mass Index ("BMI"), are more easily manipulated.

11.    Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs were intended to create the impression that these were "miracle drugs" to help users lose weight. However, Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug); the drugs do not result in meaningful weight loss for up to 15% of people;[2] the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight;[3] and that a person will need to stay on these drugs for the rest of their lives to maintain the weight loss.[4] What is worse, Defendants kept this information hidden while actively degrading trust in the prevailing view that lifestyle changes like proper nutrition and exercise were the keys to health and can accomplish long-lasting weight loss and management for most people.

12.    The efforts to engrain GLP-1 RAs, such as Saxenda, in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs both for people with diabetes and for people seeking to lose weight, whether they were using the drug as prescribed

---

[2] Erica Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders'*, BECKER'S HOSPITAL REV. (Apr. 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

[3] Gao, et al., *Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A systematic review and meta-analysis of randomized controlled trials*, FRONTIERS IN PHARMACOLOGY 1 (2022).

[4] Wilding, et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 DIABETES OBES METAB. 1553, 1562 ("[T]reatment withdrawal led to most of the weight loss being regained within 1 year, …, reinforcing the need for continued treatment to maintain weight loss ….").

or off-label. Plaintiff would not have taken GLP-1 RAs if she had been provided a full and clear warning of the true risks of taking these drugs.

13.     Defendants' efforts to expand and grow the market both for treatment of diabetes and weight-loss, whether off-label or not, worked. The U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.[5] This growth is a tremendous boon to Defendants, but comes at a significant cost. Financially, it is expected that Defendants' lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years. Some analysts project that this will add $13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, causing a significant shift in premiums and coverage in other areas.[6]

14.     The outsized growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment paths. Defendants' marketing campaigns have altered the public understanding of weight loss treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs." But, these patients, like Plaintiff, were lured into a false sense of hope that GLP-1 RAs would guarantee results and be efficacious and safe. Plaintiff injected herself with GLP-1 RAs believing that she was doing something to promote her health when, in fact, it had the opposite effect.

15.     As a result of the foregoing, Plaintiff has suffered and was diagnosed with various forms of injury which were directly and proximately caused by her regular and prolonged use of

---

[5] J.P. Morgan Research, *The increase in appetite for obesity drugs* (Nov. 29, 2023), available at https://www.jpmorgan.com/insights/global-research/current-events/obesity-drugs#sectionheader#0.
[6] Vanderbilt University Medical Center, *Cost of covering antiobesity drugs could be billions to Medicare despite, a new analysis finds* (Mar. 15, 2023), available at https://www.vumc.org/health-policy/medicare-antiobesity-medications-nejm.

GLP-1 RAs. Plaintiff's injuries include, but are not limited to, NAION and its sequelae, including blindness, blurry and/or darkened vision leading to falls and injuries, and emotional distress, among other injuries

## PARTY PLAINTIFF

16.    Plaintiff, BARBARA SMITH, is a citizen of the United States, and is a resident of the State of Wyoming.

17.    Plaintiff is 67 years old.

18.    Plaintiff used Saxenda from approximately December 2021 to March 2022.

19.    As a result of using Saxenda, Plaintiff was caused to suffer from NAION and its sequelae, including blindness and blurry and/or darkened vision leading to falls and injuries.

20.    As a result of using Saxenda, Plaintiff was caused to suffer from the injuries identified above and, as a result, sustained severe personal injuries, pain, suffering, and emotional distress, and incurred medical expenses

## DEFENDANTS

21.    Defendant Novo Nordisk Inc. is and at all relevant times has been a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.

22.    Defendant Novo Nordisk A/S is and at all relevant times has been a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

23.    Defendants Novo Nordisk Inc. and Novo Nordisk A/S are referred to collectively herein as "the Novo Nordisk Defendants", "Novo Nordisk", or "Novo."

24.    Each of the Novo Nordisk Defendants was the agent and employee of Novo Nordisk and the other Defendants and, in doing the things alleged, was acting within the course

6

and scope of such agency and employment and with Novo Nordisk and the other Defendants' actual and implied permission, consent, authorization and approval.

25.    In collaboration amongst themselves, as part of their business, and at all relevant times, the Novo Nordisk Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Ozempic, Rybelsus, Wegovy, Victoza, and Saxenda. Alternatively, Novo has acquired the entity or entities who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed GLP-1 RAs, including Ozempic, Rybelsus, Wegovy, Victoza, and Saxenda, and is, thus, the successor to such entity or entities.

26.    At all relevant times, each Defendant conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of GLP-1 RAs, including Ozempic, Rybelsus, Wegovy, Victoza, and Saxenda, within Plaintiff's state of residence, Wyoming.

**FACTUAL ALLEGATIONS**

### A. Introduction to GLP-1 and GLP-1 RA Products

27.    Researchers first discovered GLP-1 in hamsters in 1983.[7] It is a hormone that helps regulate blood sugar, appetite, and digestion in animals, including humans; and is produced naturally in the brain and intestinal wall of humans.

28.    In 1993, researchers discovered that a peptide from the venom of gila monsters activated GLP-1 receptors.[8] Gila monsters can go for months without eating but maintain stable

---

[7] Bell, et al., *Hamster preproglucagon contains the sequence of glucagon and two related peptides*, 302 NATURE 716 (1983).
[8] Thorens, et al., *Cloning and functional expression of the human islet glp-1 receptor*, 42 DIABETES 1678 (1993).

blood sugar levels because they make very high levels of a glucagon peptide called exendin-4. Thus, the gila monster served as the inspiration for the GLP-1 RA class of drugs.

29.    Following the discovery that exendin-4 is similar in structure to GLP-1, a synthetic version of exendin-4 was developed to treat diabetes. This became the first GLP-1 drug, known as Byetta, with the active ingredient exenatide, which came to market in 2005. Byetta was initially brought to market as a collaboration between Eli Lilly and Amylin.[9] Whereas naturally-occurring GLP-1 has a short half-life of just a few minutes, Byetta's half-life was noted to be 2.4 hours.[10]

30.    Simultaneously with the development of exenatide, Novo was developing another GLP-1 drug called liraglutide. In the early 1990s, Novo researchers discovered that when they injected liraglutide into rats, it caused them to stop eating almost entirely.[11] Liraglutide came to market in 2010, marketed initially as Victoza and later as Saxenda. Liraglutide has a half-life of 13-15 hours.[12]

31.    Various active ingredients fall within the GLP-1 RA class of drugs, including semaglutide (marketed by Novo as Ozempic, Wegovy, and Rybelsus), liraglutide (marketed by Novo as Saxenda, Victoza, and in combination with insulin as Xultophy 100/3.6), tirzepatide (marketed by Lilly as Mounjaro and Zepbound), dulaglutide (marketed by Lilly as Trulicity), exenatide (marketed by various companies as Byetta, Bydureon, and Bydureon BCise), albiglutide (marketed by GlaxoSmithKline as Tanzeum), and lixisenatide (marketed by Sanofi as Adlyxin and

---

[9] News Release: Amylin and Lilly Announce FDA Approval of BYETTA(TM) (Exenatide Injection) (Apr. 29, 2005), *available at* https://investor.lilly.com/news-releases/news-releasedetails/amylin-and-lilly-announce-fda-approval-byettatm-exenatide (last visited Nov. 8, 2023) (describing the drug as a "collaboration" between Amylin and Lilly).

[10] Cai, et al., *Long-acting preparations of exenatide,* DRUG DES. DEVEL. THER. (Sept. 2013).

[11] Gina Kolata, *We Know Where New Weight Loss Drugs Came From, but Not Why They Work*, NEW YORK TIMES (Aug. 17, 2023), available at https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html.

[12] Rubino, et al., *Effect of Weekly Subcutaneous Semaglutide vs Daily Liraglutide on Body Weight in Adults with Overweight or Obesity without Diabetes: The STEP 8 Randomized Clinical Trial,* JAMA (Jan. 2022).

in combination with insulin as Soliqua 100/33). The U.S. Food & Drug Administration ("FDA") recognizes GLP-1 RAs as a class of drugs based on similarities in their mechanisms of action, physiologic effects, and chemical structure.[13] Defendants likewise recognize that their GLP-1 RAs are members of the same class.[14]

32.     Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1 in numerous ways,[15] including attaching to GLP-1 receptors, sending various signals in the body, triggering a sensation of satiety (or perception of fullness, thereby curbing users' appetites and decreasing intake of calories and nutrients),[16] acting on the pancreas to stimulate the release of insulin, suppressing the release of glucagon, and slowing or inhibiting gastric emptying and intestinal motility.[17]

33.     In contrast to naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes, GLP-1 RAs are engineered to last longer, as previously noted. The chemical structure of GLP-1 RAs includes a fatty chain that inhibits such quick dissolution. GLP-

[13] *See* FDA Ozempic Summary Review, available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209637Orig1s000SumR.pdf at 8 (including liraglutide, dulaglutide, and semaglutide in the GLP-1 RA class) (last visited Jan. 2, 2025); *see also* FDA Mounjaro Clinical Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000MedR.pdf at 52 (results of tirzepatide toxicology studies in animals were typical of the GLP-1 RA pharmacologic class) (last visited Jan. 2, 2025); *see also* https://www.fda.gov/industry/structuredproductlabeling-resources/pharmacologic-class (last visited Dec. 28, 2023).
[14] SURMOUNT-1 Clinical Trial Protocol at 45, available at
https://cdn.clinicaltrials.gov/largedocs/22/NCT04184622/Prot_000.pdf ("General safety characteristics of all studied doses of tirzepatide were similar to those of the GLP-1R agonist class…"); STEP-1 Clinical Trial Protocol at 15, accessible at https://cdn.clinicaltrials.gov/large-docs/35/NCT03548935/Prot_002.pdf ("[T]he tolerability and safety profile [of semaglutide] was overall consistent with… the GLP-1 RA class in general.").
[15] Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at
https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.
[16] *See* Bloemendaal, et al., *Effects of glucagon-like peptide 1 on appetite and body weight: focus on the CNS,* J. ENDOCRINOLOGY (Apr. 2014).
[17] Deane, et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J. CLINICAL ENDO. METAB., 225-221 (January 1, 2010), available at https://academic.oup.com/jcem/article/95/1/215/2835243; American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (Jun. 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-takingpopular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery.

RAs such as semaglutide have a long half-life of well over 100 hours, causing the drugs to stay in the body for a month or more after the last dose.

34. Most GLP-1 RAs are approved to treat type 2 diabetes,[18] but some (Wegovy, Saxenda, and Zepbound) are approved to treat obesity or to reduce cardiovascular risks.

35. Most GLP-1 RAs are administered by injection, with the exception of Rybelsus, which is in tablet form.[19]

36. Most of the GLP-1 RAs at issue in this case are weekly injectable drugs, except that liraglutide (the active ingredient in Saxenda and Victoza) is a daily injectable drug.[20]

37. Most GLP-1 RAs are dosed between 0.25 and 2 milligrams per week, except that the maximum dose for Wegovy is 2.4 milligrams per week, and the maximum dose for Mounjaro is 15 milligrams per week.

38. Because the risks associated with GLP-1 RAs are common to the entire class of drugs, any evidence regarding the association between NAION and its sequelae and *any* GLP-1 RA (such as tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risk of NAION associated with these drugs.

### 1. FDA's Approval of Saxenda

39. On December 20, 2013, Novo Nordisk Inc. submitted NDA (New Drug Application) 206321, requesting that the FDA grant it approval to market and sell Saxenda (liraglutide 3 mg) in the United States as an adjunct to a reduced calorie diet and increased physical

---

[18] Unlike patients with type 1 diabetes, who cannot produce insulin, patients with type 2 diabetes cannot use insulin properly. *Compare* Cleveland Clinic, *Type 1 Diabetes* (Mar. 9, 2022), available at https://my.clevelandclinic.org/health/diseases/21500-type-1-diabetes, *with* Cleveland Clinic, *Type 2 Diabetes* (Nov. 8, 2023), available at https://my.clevelandclinic.org/health/diseases/21501-type-2-diabetes.
[19] Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.
[20] *Id.*

activity for chronic weight management in adults with an initial body mass index (BMI) of either $30/kg/m^2$ or greater (obese), or $27\ kg/m^2$ or greater (overweight) combined with at least one weight-related comorbid condition. Following the receipt of several amendments, the FDA approved NDA 206321 on December 23, 2014.[21]

40.    At the same time, Novo Nordisk was seeking approval for Saxenda from health organizations worldwide. Health Canada approved Saxenda for chronic weight management in February 2015. The European Commission authorized Saxenda for marketing throughout the European Union (EU) to help manage weight in adults in March 2015.[22]

41.    On April 26, 2017, the FDA approved an updated Saxenda injectable 3 mg label, based on the findings of the SCALE Obesity and Pre-diabetes 3-year trial.[23]

42.    On December 4, 2020, the FDA approved Novo Nordisk's  supplemental NDA for Saxenda for chronic weight management in pediatric patients aged 12 years and older who are obese, as defined by specific body mass index (BMI) cut-offs for age and sex that correspond to BMI $30\ kg/m^2$ or higher for adults, and who weigh more than 60 kg (132 pounds).[24] In the press release, Novo Nordisk touted the "safety and efficacy of Saxenda as a treatment for adolescents with obesity[.]"[25] As with its prior press releases, Novo Nordisk disclosed Important Safety

---

[21] FDA Approval Letter for NDA 206321 (Saxenda), available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/206321Orig1s000Approv.pdf (visited on 11/20/23).
[22] Clinical Trials Arena, *Saxenda (liraglutide) for the treatment of obesity, US* (Aug. 4, 2023), available at
https://www.clinicaltrialsarena.com/projects/saxenda-liraglutide-obesity/?cf-view (visited 11/20/23).
[23] FDA Supplemental Approval for NDA 206321/S-004, available at https://www.accessdata.fda.gov/drugsatfda
docs/nda/2019/206321Orig1s004.pdf (visited on 11/20/23).
[24] FDA Supplemental Approval for NDA 206321/S-012, -013, -014, available at
https://www.accessdata.fda.gov/drugsatfda docs/appletter/2020/206321Orig1s012,%20s013,%20s014ltr.pdf (visited on 11/20/23).
[25] Novo Nordisk, *FDA approves Saxenda for the treatment of obesity in adolescents aged 12-17* (Dec. 4, 2020), available at https://www.prnewswire.com/news-releases/fda-approves-saxenda-for-the-treatment-of-obesity-in-adolescents-aged-12-17-301186800.html (visited 11/20/23).

Information and provided links to the Medication Guide and Prescribing Information, but gastroparesis and its sequelae were not identified as a side effect or risk.

### 2. Novo Nordisk's Marketing and Promotion of Saxenda

43. On December 23, 2014, Novo Nordisk announced the approval of Saxenda (liraglutide 3 mg) as the first, once-daily human GLP-1 analogue for the treatment of obesity. In its announcement, Novo Nordisk's executive vice president and chief science officer, Mads Krogsgaard Thomsen, touted that "[m]any people with obesity suffer from comorbidities. Saxenda has the potential to help some of these people achieve and maintain clinically significant weight loss and improve their weight-related comorbidities."[26]

44. An article published in Fierce Biotech described the approval of Saxenda as "a milestone for [Novo Nordisk] as it blueprints a future in the obesity drug market." The author reported that Novo Nordisk believes "Saxenda will serve as a springboard into a bright future developing weight-loss treatments" and had already planned "to make obesity a full-fledged therapeutic area" despite the recent history of disappointing launches for other weight-loss therapies due to safety concerns and payer disinterest.[27]

45. On April 22, 2015, Novo Nordisk announced that Saxenda was commercially available in the United States as "a new treatment that can provide some patients who have obesity or are overweight with comorbidities a new path to achieving clinically meaningful weight loss".[28] Reuters described the launch as "a long-awaited milestone that will provide a new revenue stream

---

[26] Novo Nordisk, *Novo Nordisk receives FDA approval for Saxenda for the treatment of obesity* (December 23, 2014), available at https://www.novonordisk.com/content/nncorp/global/en/news-and-media/news-and-ir-materials/news-details.html?id=1430 (visited on 11/20/23).

[27] Garde, D., Fierce Biotech, *Novo Nordisk kick-starts its obesity franchise with a long-awaited FDA nod* (December 23, 2014), available at https://www.fiercebiotech.com/regulatory/novo-nordisk-kick-starts-its-obesity-franchise-a-long-awaited-fda-nod (visited on 11/20/23).

[28] Novo Nordisk, *Novo Nordisk announces Saxenda® (liraglutide [rDNA origin] injection) is now commercially available in the United States* (April 22, 2015), available at https://www.novonordisk-us.com/media/news-archive/news-details.html?id=36770#:~:text=Approved%20June%208%2C%202014. (visited on 11/20/23).

12

for the Danish drugmaker" and noted that Novo Nordisk "expects sales from [the drug] to eventually reach $1 billion a year." Novo Nordisk indicated that it "plans to use 500 of its 3,000-strong U.S. sales force to promote Saxenda[.]"[29]

46.    On April 27, 2017, Novo Nordisk announced that the FDA had approved an updated product label for Saxenda including data showing that approximately half of patients on Saxenda (26% vs 10% on placebo) who lost more than or equal to 5% of their weight after 56 weeks (56% vs 25% on placebo) maintained their weight loss for 3 years. Novo Nordisk stated that the "long-term study data reinforce the established safety profile of Saxenda"; however, it reported that "[t]he most common side effects were gastrointestinal (nausea and diarrhea) and more frequent with Saxenda® treatment than with placebo."[30]

47.    In March 2020, it was reported that "[s]ince its 2014 FDA approval, Saxenda has become a top-selling obesity therapy, with about 56% share of the global obesity prescription drug market, according to Novo Nordisk. In 2019, sales of the product jumped 47% to reach 5.68 billion Danish krones ($850 million)."[31]

48.    On December 4, 2020, Novo Nordisk announced that the FDA had approved an updated label for Saxenda for use in the treatment of obesity in adolescents (12–17 years) with a body weight above 60 kg and an initial BMI corresponding to 30 kg/m2 or greater for adults, as an adjunct to reduced-calorie meals and increased physical activity. The press release stated that

---

[29] Jensen, T., et al. Reuters, *Novo launches Saxenda in U.S., sees more launches in 2015* (April 22, 2015), available at https://www.reuters.com/article/us-novonordisk-saxenda/novo-launches-saxenda-in-u-s-sees-more-launches-in-2015-idUSKBN0ND1KX20150422/.

[30] News provided by Novo Nordisk, PR Newswire, *Novo Nordisk Receives FDA Approval of Saxenda® (liraglutide) injection 3 mg Label Update Including Long-Term Safety and Efficacy Data from 3-Year Trial* (April 27, 2017), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-saxenda-liraglutide-injection-3-mg-label-update-including-long-term-safety-and-efficacy-data-from-3-year-trial-300447261.html (visited on 11/20/23).

[31] Liu, A., Fierce Biotech, *Insights into how Novo Nordisk's Saxenda cuts food cravings may inspire new obesity drugs* (March 5, 2020) available at https://www.fiercebiotech.com/research/sickle-cell-gene-therapy-process-may-cause-cancer-linked-mutations-blood-stem-cells (visited on 11/20/23).

13

"[t]he safety and efficacy of Saxenda® as a treatment for adolescents with obesity is supported by data from a phase 3a trial published earlier this year in the New England Journal of Medicine;" however, it was noted that the most common adverse reactions observed in the adolescent population "were gastrointestinal events, including nausea, vomiting and diarrhea."[32]

49.    Novo Nordisk promoted the safety and sale of Saxenda in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

50.    In fall 2021, as part of its weight-loss drug promotions, Novo Nordisk launched a celebrity-endorsed, direct-to-consumer obesity awareness campaign designed to steer the narrative about obesity "away from 'blame, shame, bias, and stigma' and toward empathy and understanding" along with a physician education site "Rethink Obesity", to persuade doctors to discuss obesity treatment with patients.[33]

51.    In December 2021, Novo Nordisk launched a full-scale television advertisement "Science for Obesity" to promote Saxenda exclaiming: "it turns out there's a science to obesity"… to which a would-be patient responds: "which is why my doctor added Saxenda to my weight loss plan." While advising viewers that doctors are prescribing Saxenda because it is scientifically sound, Novo Nordisk neither mentions nor warns of the risk of developing gastroparesis and its

---

[32] Novo Nordisk, *FDA approves Saxenda® for the treatment of obesity in adolescents aged 12-17* (December 4, 2020), available at https://www.novonordisk-us.com/media/news-archive/news-details.html?id=39225 (visited on 11/20/23).

[33] Natalie Missakian, *Novo Nordisk casts Queen Latifah in TV-themed awareness campaign for obesity*, Fierce Pharma (Nov. 1, 2021), available at https://www.fiercepharma.com/marketing/queen-latifah-tackles-obesity-tv-inspired-awareness-campaign-for-novo-nordisk (visited on 9/19/23).

sequelae in the advertisement.[34] Since 2018, Novo Nordisk has spent more than $884,000,000 on television ads in the United States to promote its GLP-1 medications.[35]

52.     On February 2, 2022, Novo Nordisk announced its 2021 financials, in which it reported that its North America operations had increased obesity care sales by 83% at constant exchange rates (CER).[36] An article reporting on the announcement stated that in 2021, Novo Nordisk earned approximately $1.2 billion from sales of Wegovy and its earlier weight loss treatment Saxenda and that Novo Nordisk aimed to increase obesity drug sales to more than $3.7 billion.[37]

53.     On February 8, 2022, it was reported that Novo Nordisk "intends to promote its previous obesity drug Saxenda (liraglutide) to maintain its market share in obesity" to counter the supply issues associated with its obesity drug Wegovy.[38] As a result, sales of Saxenda jumped 53% in 2022, reaching $10.7 billion Danish krones ($1.6 billion USD), and sales have continued to surge in 2023 with sales already hitting $3.3 billion Danish krones ($484 million USD) in the first quarter alone.[39] According to a July 2023 article in Fortune, renewed interest in Saxenda prescriptions jumped nearly 30,000 between May 2023 and June 2023, the biggest monthly jump

---

[34] iSpot.tv, *Saxenda TV Spot, "Science to Obesity"* (Dec. 10, 2021), available at https://www.ispot.tv/ad/q_p4/saxenda-science-to-obesity (visited 11/20/23).

[35] Ritzau, *Novo Nordisk runs TV ads in US for multimillion-dollar sum*, MedWatch (April 26, 2023), available at https://medwatch.com/News/Pharma___Biotech/article15680727.ece (visited on 9/26/23).

[36] Novo Nordisk, Company Announcement, *Financial report for the period 1 January 2021 to 31 December 2021* (Feb. 2, 2022), available at https://www.novonordisk.com/content/dam/nncorp/global/en/investors/pdfs/financial-results/2021/Q4-2021-company-announcement.pdf, at 12 (visited on 9/19/2023).

[37] Nate Pagliarulo, *Novo sees fast growth ahead of obesity drugs despite production hurdles*, BioPharmaDive (Mar. 4, 2022), available at https://www.biopharmadive.com/news/novo-wegovy-obesity-sales-demand-outlook/619834/ (visited on 9/19/23).

[38] Globaldata Healthcare, Pharmaceutical Technology, *Novo Nordisk's Wegovy has supply challenges but maintains success in diabetes and obesity space* (March 17, 2023), available at https://www.pharmaceutical-technology.com/comment/novo-nordisks-wegovy-supply-challenges/?cf-view (visited on 11/20/23).

[39] Fierce Pharma, *Obesity drug shortage expands to Saxenda as Novo Nordisk warns of limited supply for 2023 and beyond* (July 19, 2023), available at https://www.fiercepharma.com/pharma/obesity-drug-shortage-expands-saxenda-novo-nordisk-warns-limited-supply-2023-and-beyond (visited on 11/20/23).

over the past two years.[40] On July 19, 2023, it was reported that "Saxenda will have limited availability through the end of 2023 because of surging demand." In a statement to Fierce Pharma, a Novo Nordisk spokesperson said the company continues to see demand for Saxenda increase "at a substantial rate" and that "many patients will have difficulty filling their Saxenda prescriptions for the remainder of 2023 and beyond."[41]

54.     In February 2023, the Financial Times reported that Novo Nordisk issued an apology, stating that "its branding was missing from a LinkedIn post promoting online weight loss webinars and e-learning modules" that it sponsored from February 2020 to December 2021. The article noted that "[t]he webinars, which were viewed by thousands of healthcare professionals, preferentially included positive information about Novo Nordisk's weight loss drug Saxenda that the self-regulatory watchdog deemed a "disguised" large-scale promotional campaign.[42] A month later, an article published in the BMJ reported that Novo Nordisk had "been suspended as a member of the Association of the British Pharmaceutical Industry (ABPI) for two years because of 'serious breaches' of the organization's code of practice." According to the publication's author, Novo Nordisk "failed to disclose clearly its sponsorship of a weight management training course for healthcare professionals which included positive information on its obesity drug Saxenda (liraglutide)", and the ABPI "was concerned that Novo Nordisk did not recognize that this was a

---

[40] Court, E., et al., Fortune, *Yet another weight loss drug is now hard to get as high demand creates major shortages* (July 18, 2023), available at https://fortune.com/2023/07/18/weight-loss-drug-saxenda-shortage/ (visited on 11/20/23).

[41] Liu, A., Fierce Pharma, *Obesity drug shortage expands to Saxenda as Novo Nordisk warns of limited supply for 2023 and beyond* (July 19, 2023), available at https://www.fiercepharma.com/pharma/obesity-drug-shortage-expands-saxenda-novo-nordisk-warns-limited-supply-2023-and-beyond (visited on 11/21/23).

[42] Kuchler, H., et al. Financial Times, *Novo Nordisk apologises for not disclosing sponsorship of anti-obesity training* (February 12, 2023), available at https://www.ft.com/content/591772df-0451-4348-9bad-f375ed4b7ede (visited on 11/20/23).

large scale Saxenda promotional campaign which the company had knowingly paid for and which was 'disguised.'"[43]

55.    On May 31, 2023, an article citing Bloomberg Intelligence projected that Novo Nordisk's "megablockbuster" anti-obesity drugs Saxenda and Wegovy are set to haul in $44 billion by the end of the decade. This would be "a major ballooning of the market that was worth just $2.5 billion last year[]", with 70% of sales coming from within the United States. The article speculated that these figures could trend even higher because Novo Nordisk (along with its competitor Eli Lilly) are working on oral versions of their popular weight-loss drugs.[44]

56.    On July 5, 2023, it was reported that Novo Nordisk had spent $11,000,000 on food and travel for doctors as part of their efforts to promote their GLP-1 medications, including Saxenda. In 2022 alone, Novo Nordisk bought more than 457,000 meals to educate doctors and other prescribers about its GLP-1s, with nearly 12,000 doctors receiving more than 50 meals and snacks from Defendants. In 2022, Novo Nordisk also spent $2 million flying doctors to London, Paris, Orlando, and Honolulu related to its GLP-1s.[45]

57.    On July 21, 2023, it was reported that Novo Nordisk had purchased more than 457,000 meals—at a total price of more than $9 million—to educate prescribers about Saxenda and its other GLP-1s. The president and CEO of the Alliance of Community, who was interviewed for the article, described the expenditures as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about

---

[43] Wise, J., thebmj, *Novo Nordisk suspended from industry body over serious breaches* (March 17, 2023), available at https://www.bmj.com/content/380/bmj.p634 (visited on 11/20/23).

[44] Fierce Pharma, Marking us thinner will see fatter profits for pharma as Bloomberg's crystal ball predicts obesity drug sales hitting $44B by 2030 (May 31, 2023), available at https://www.fiercepharma.com/marketing/making-us-thinner-will-see-fatter-profits-pharma-bloombergs-crystal-balls-predicts (visited 11/20/23).

[45] Florko, N, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic,* National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordisk-gave-doctors-450000-meals-ozempic (visited on 9/20/23).

their potential side effects and long-term effectiveness. The author pointed out that research published in spring 2023 "suggested that GLP-1s could put patients at an elevated risk of a potentially fatal gastrointestinal condition that requires surgery."[46]

58. Saxenda continues to surge in popularity on social media. On TikTok, the hashtag #Saxenda currently has over 615 million views.[47]

59. At all relevant times, Novo Nordisk was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Saxenda.

### B. The Medical Literature and Clinical Trials Gave Defendants Notice of NAION and its Sequelae Being Causally Associated with GLP-1RAs.

60. NAION is a medical condition involving damage to the optic nerve resulting in the loss of vision.

61. NAION is irreversible and permanent.

62. NAION falls within the category of an eye stroke.

63. NAION is untreatable and can lead to permanent blindness.

64. While the precise cause of NAION is unknown, the general belief among the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

65. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanied pain such as a headache or periocular pain.

---

[46] Erin Prater, *Ozempic manufacturer Novo Nordisk spent $11 million last year 'wining and dining' doctors. Experts slam the move as a breach of doctor-patient trust,* Fortune Well (July 21, 2023), available at https://fortune.com/well/2023/07/21/ozempic-novo-nordisk-meals-travel-prescribing-doctors/ (visited on 9/19/23).
[47] https://www.tiktok.com/tag/saxenda (visited on 11/20/23).

66.    The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

67.    After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

68.    Some NAION patients lose complete vision with no recovery in affected eye(s).

69.    Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.

70.    Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[48]

71.    About 15% of patients who have NAION in one eye eventually develop it in their other eye.[49]

72.    GLP-1 RAs are treated as a class by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

73.    It has been known since at least 2016 that the human eye contains GLP-1 receptors.[50]

74.    Defendants knew or should have known of the causal association between the use of Saxenda and the risk of developing NAION and its sequelae, but they ignored it.

---

[48] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 10/10/2025), available at https://my.clevelandclinic.org/health/diseases/ischemic-optic-neuropathy
[49] *Id.*
[50] Hernández C et al, *Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes*, DIABETES;65(1):172-87 (Jan 2016). doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.

75.     The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

76.     The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[51]

77.     A meta-analysis of all clinical trials of GLP-1RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[52]

78.     The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk.[53]

79.     The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION." [54]

80.     A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[55]

81.     Defendants knew or should have known of the risk of NAION with use of Saxenda.

---

[51] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

[52] Silverii GA et al, *Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy. A meta-analysis of randomised controlled trials*, Diabetes Obes Metab, 2024 (available as a pre-print manuscript as of November 20, 2024), https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076.

[53] *Id*.

[54] *Id*.

[55] Kevin Dunleavey, *After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe*, Fierce Pharma, (Dec. 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited 12/18/2024); see also Naomi Kresge, *Ozempic Link to Rare Vision Loss Risk Confirmed in Study*, Bloomberg, (December 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial?leadSource=uverify%20wall (last visited 12/18/2024).

82.    Defendants conduct clinical trials and have access to case reports and medical literature that provide them with superior knowledge compared to the general public as to potential risks of its medications.

83.    For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[56]

84.    The event occurred within the semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION. [57]

85.    Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.[58]

86.    The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide", authored by Hathaway et al., involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D), and 979 were overweight or obese.[59]

---

[56] *A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes* (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. Accessed February 18, 2025.
[57] *Id.*
[58] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol.;142(8):732–39 (2024). doi:10.1001/jamaophthalmol.2024.2296
[59] *Id.*

87.     Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications. [60]

88.     Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications. [61]

89.     Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P$ < .001; concordance coefficient = 0.84). [62]

90.     Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86). [63]

91.     The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a

---

[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*

substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[64]

92.     Acknowledging the pathogenesis or cause of NAION remains unknown. The authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[65]

93.     A meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendants' own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[66] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk.[67] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[68]

94.     On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[69]

95.     This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors

---

[64] *Id*.

[65] *Id*.

[66] Silverii GA, Pala L, Cresci B, Mannucci E. *Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials*. DIABETES OBES METAB.; 27(2): 1005-09 (2025). doi:10.1111/dom.16076

[67] *Id*.

[68] *Id*.

[69] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574

(SGLT-2s), another diabetes medication.[70] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[71]

96.     In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023,[72] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[73]

97.     "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[74]

98.     The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[75]

99.     Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[76]

100.    Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION.

---

[70] *Id.*
[71] *Id.*
[72] Grauslund J, Taha AA, Molander LD, et al. *Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes.* INTL. JOURNAL OF RETINA AND VITREOUS.;10(1):97 (2024). doi:10.1186/s40942-024-00620-x
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*

The PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[77]

101.    In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[78]

102.    A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[79]

103.    The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[80]

104.    The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

105.    A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and

---

[77]https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/

[78]https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness

[79] Katz BJ, Lee MS, Lincoff NS, et al. *Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide*. JAMA OPHTHALMOL. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058

[80] *Id*.

weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[81]

### C.  Defendants Failed to Warn of the Risk of NAION and its Sequelae

106.    The label for Saxenda has been updated on at least twenty-two (22) occasions since 2014.[82]  Despite all of these iterations of the Saxenda label, Defendants' labels have not contained any warning or any information whatsoever on the increased propensity of Saxenda to cause NAION and permanent vision loss as suffered by Plaintiff.

107.    Furthermore, Defendants have failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting GLP-1RAs, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

108.    Nothing was or is stopping Defendants from adding a warning regarding the risk of NAION. Defendants could have at any time made "moderate changes" to the label.

109.    Specifically, Defendants could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Saxenda's label without any prior FDA approval.

110.    Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such

---

[81] Massy, et al. *Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data*, BMC MEDICINE (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

[82] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/206321Orig1s000ltr.pdf (last visited July 20, 2026).

changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

111.    On July 3, 2024, the Journal of the American Medical Association ("JAMA") – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[83]

112.    The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[84]

113.    The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[85]

---

[83]Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited 12/17/2024).

[84] Id.

[85] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard

**1. The Sponsor of a Drug is Responsible for Ensuring the Safety of Its Drug and for Warning**

114.    The Sponsor of a drug is responsible for the safety of its product.

115.    A drug company is responsible for alerting healthcare providers and patients of risks that are unknown or not well understood.

116.    The Institute of Medicine has stated that FDA's ability to oversee drug safety is limited, especially after approval of a drug.

117.    The Institute of Medicine wrote the following in a report entitled The Future of Drug Safety: Promoting and Protecting the Health of the Public: "The drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER (FDA Center for Drug Evaluation and Research) that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement." The Report further stated that "FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion."

118.    The FDA has insufficient resources to monitor the 11,000 drugs on the market.

119.    Manufacturers have access to information about their drugs, especially in the post-approval phase as new risks emerge, that is superior to the access that FDA has.

120.    Uncommon risks, or those that appear as common conditions, develop after long periods of time, or have adverse impacts on special populations, may go undetected in clinical trials.

121. If a drug company has reason to know the risks of a drug may result in adverse events, even if it develops that knowledge in the post-approval context, that company has a responsibility to investigate those risks and to provide necessary information healthcare providers.

122. The following FDA standards govern a manufacturer's duty to warn: 21 C.F.R. § 201.57(c)(6): Warnings and precautions: "This section must describe clinically significant adverse reactions … the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association of a serious hazard with a drug; a causal relationship need not have been definitely established …"

123. In addition, under 21 C.F.R. § 201.57(c)(6), the Warning and Precaution Section of prescription drug labels must "describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards …"

124. It is a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.

125. A manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.

126. According to industry guidance on warnings in labeling from the FDA in 2011, "The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are serious or are otherwise clinically significant because they have implications for prescribing decisions or for patient management."[86]

---

[86] U.S. Dept. of Health & Human Services, Food & Drug Admin., *Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format* (Oct. 2011), at 5, available at https://www.fda.gov/files/drugs/published/Warnings-and-Precautions--Contraindications--and-Boxed-Warning-

127.    FDA's Guidance also states, "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section."[87]

128.    The medical literature discussing gastroparesis describes the distressing nature of the condition and its potential to profoundly limits a person's quality of life.[88]

### 2. Defendants' Marketing of GLP-1 RAs Was Intentionally Deceptive and Misleading and Lacked Fair Balance

129.    Defendants' extensive multifaceted advertising, marketing and promotion of GLP-1 RAs consistently highlighted and overstated the weight loss benefits of taking a GLP-1 RA while failing to disclose the risks identified with those drugs and concealing other information that would be material to Plaintiff and their physician in weighing the risks and benefits of taking a GLP-1 RA.

130.    Defendants did not disclose the risks of developing NAION and its sequelae.

131.    In addition, Defendants intentionally omitted other facts that they knew to be true from their labels, physician communications, marketing, website, public statements, and other public facing communications. These documents omit facts that include: (1) the average person only loses a small percentage of their body weight while on a GLP-1 RA; (2) GLP-1 RAs are not effective for everyone; (3) patients gain the weight back when they stop taking the GLP-1 RA (i.e., patients have to stay on the drug forever); (4) the weight loss achieved while on a GLP-1 RA is

---

Sections-of-Labeling-for-Human-Prescription-Drug-and-Biological-Products-%E2%80%94-Content-and-Format.pdf.

[87] *Id*. at 6.

[88] *See generally, e.g.*, Lee et al, *Health-Related Social Needs in Patients With Gastroparesis: Relationships to Symptom Severity and Quality of Life*, 6 GASTRO. HEP. ADV. 48 (2023); Simons & Kline, *Scoping review: the social and emotional impacts of gastroparesis*, TRANSL. GASTROENTEROL. HEPATOL. (2024).

not a healthy weight loss; (5) when a patient regains the weight loss achieved while on a GLP-1 RA, they are typically less healthy than when they began the medication; and (6) many people stop taking a GLP-1 RA relatively quickly because of trouble tolerating the drugs. These facts are critical to the balancing of risks and benefits facing most patients.

### a. Average Weight Loss is Modest

132.    Studies show that the real numbers are much lower. Measured across the first 12 weeks of the drug, when most people are on the drug, the numbers are closer to 3.6% to 5.9% of body weight.[89] On July 8, 2024, a JAMA Internal Medicine article suggested that both Novo and Lilly overstated the weight loss benefits of their drug in advertisements. Over a year's time, those on tirzepatide (Mounjaro/Zepbound) lost an average of 15.3% of their body weight compared to 8.3% for semaglutide (Ozempic/Wegovy) users. Only 18% of those on semaglutide reported a weight loss of at least 15% of their body weight after one year of treatment.[90] More importantly, Novo's claim that their drugs create lasting weight loss are also misleading: their own data shows that only 9.4% of patients on the highest dose available sustain weight loss over a four-year period.[91]

### b. Non-Responders

133.    Some research suggests that patients taking semaglutide (i.e., Ozempic and Wegovy) "found about 14% of patients lost less than 5% of their body weight and one-third lost less than 10%" while a separate trial focused on tirzepatide (Mounjaro and Zepbound)

---

[89] *See* https://www.wegovy.com/aboutwegovy/why-wegovy.html for Novo Nordisk and https://zepbound.lilly.com/ for Lilly.

[90] Rodriguez et al., *Semaglutide vs Tirzepatide for Weight Loss in Adults With Overweight or Obesity*, 184(9) JAMA INTERN. MED. 1056–64 (2024), doi:10.1001/jamainternmed.2024.2525, available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2821080.

[91] Novo Nordisk, *Obesity care*, CMD24: Capital Markets Day (Mar. 7, 2024), available at https://www.novonordisk.com/content/dam/nncorp/global/en/investors/irmaterial/cmd/2024/P5-Obesity-Care.pdf.

"demonstrated similar results."[92] Notably, the article discussing the research states that "Wegovy and Zepbound have been approved by the FDA for weight loss, while Ozempic and Mounjaro have been prescribed for that purpose in an off-label fashion."

### c. Patients Must Remain on the Drug to Sustain Weight Loss

134. For those who lose weight, they typically need to stay on the drug forever to maintain the weight loss.[93] A Medscape article from March of 2024 explains that when "patients stop taking GLP-1s, they tend to regain most of that weight within a year, studies showed."[94]

135. Novo has publicly recognized that most individuals will regain all the weight back within five years of stopping Ozempic or Wegovy.[95] A trial published by Novo showed that, after a year, participants had gained back two thirds of the weight lost after they stopped taking semaglutide.[96] Indeed, Novo has acknowledged that some individuals will regain even more weight after stopping Ozempic or Wegovy than they initially lost.[97]

136. As noted by Novo's Martin Holst Lange: "once the majority of the weight loss is accrued, you don't go back and start to increase in weight if you stay on the drug."[98]

---

[92] Carbajal, Erica, *Up to 15% of patients on weight loss drugs may be 'non-responders*, BECKER'S HOSPITAL REV. (April 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

[93] M. Karth, *Is Semaglutide a Miracle Weight-Loss Drug?*, PSYCHOLOGY TODAY (Apr. 1, 2023), available at https://www.psychologytoday.com/ie/blog/the-neuroscience-of-eating-disorders/202303/ozempic-and-wegovy-is-semaglutide-a-miracle-weight.

[94] Julie Stewart, *Help Patients Prevent Weight Gain After Stopping GLP-1s*, MEDSCAPE MED. NEWS (Mar. 18, 2024), available at https://www.medscape.com/viewarticle/help-patients-prevent-weightgain-after-stopping-glp-1s-2024a10004z9?form=fpf.

[95] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[96] Wilding et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24(8) DIABETES OBES METAB. 1553-64 (2022), doi:10.1111/dom.14725, available at https://dom-pubs.onlinelibrary.wiley.com/doi/10.1111/dom.14725.

[97] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[98] K. Kindelan, *New study focuses on what happens if you stay on weight loss drug Wegovy for years*, ABC NEWS (May 20, 2024), available at https://abcnews.go.com/GMA/Wellness/new-study-focuses-stay-weight-loss-drug-

137.    Wegovy and Ozempic are often marketed as part of a "metabolic reset"[99] even though studies show that weight will be regained upon cessation and even though it has been widely recognized that GLP-1 RAs do not rewire "your neural networks to really define a new body weight setpoint."[100] Not only is it not a "reset," but some patients will actually regain even more weight after stopping the drug.[101]

138.    This was consistent with Lilly's sponsored SURMOUNT-4 study of tirzepatide, which showed that patients regained 14% of their body weight after switching from tirzepatide to a placebo.[102] On average, patients were able to maintain only about 10% of the weight they lost from the time they started taking tirzepatide.[103] Notably, the trend towards weigh regain was on clear upward trajectory at the study endpoint, suggesting patients who had ceased taking the drug would continue to regain weight over time.

139.    A meta-analysis of GLP-1 RA clinical trials found that "several GLP-1 RAs showed a gradual decline in effects on body weight throughout the long term intervention. In comparison to placebo, semaglutide resulted in a reduction of body weight from a mean difference of $-3.28$ kg (95% confidence interval $-4.20$ to $-2.37$) with medium term intervention to $-2.75$ kg ($-4.60$ to $-0.89$) with long term intervention. Liraglutide and dulaglutide also showed a similar trend."[104]

### d.  Not a Healthy Weight Loss

---

wegovy/story?id=110401021 (emphasis added).

[99] Calibrate, *How long does it take to lose weight on Ozempic?* (Jun. 5, 2022), available at https://www.joincalibrate.com/resources/how-long-does-it-take-to-lose-weight-on-ozempic.

[100] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[101] *Id*.

[102] Arone et al., *Continued Treatment With Tirzepatide for Maintenance of Weight Reduction in Adults With Obesity: the SURMOUNT-4 Randomized Clinical Trial*, 331 JAMA 38 (2023).

[103] *Id*. at 45.

[104] Yao et al., *Comparative effectiveness of GLP-1 receptor agonists on glycaemic control, body weight, and lipid profile for type 2 diabetes: systematic review and network meta-analysis*, BMJ OPEN 8 (2023).

140.    Taking GLP-1s may actually result in patients being less healthy. Defendants fully understand that overall health is more than a number, whether that number is purely weight or BMI. Despite this, the focus of prescribing GLP-1 RAs for obesity is on a person's BMI and to the extent that BMI is less than 30, whether they also have a weight-related health condition (i.e., cardiovascular disease, etc.).

141.    As previously noted, BMI is a simple calculation that includes only weight and height. This poses limitations for its usefulness on an individual basis, rather than a population basis. For example, Jalen Hurts, Quarterback of the Philadelphia Eagles, is 6 feet and 1 inch tall and weighs 223 pounds, putting his BMI at 29.4 and making him extremely overweight and borderline obese if considering BMI alone. However, this does not account for the fact that he is an elite athlete with a body fat percentage under 10 percent. Nonetheless, if he suffers additional health condition or gains 5 pounds (or simply says he weighs 5 pounds more during a telehealth visit), he would qualify for one of the Defendants' weight loss drugs.

142.    Because of these obvious limitations of BMI, the AMA has urged doctors to deemphasize their use of BMI in determining healthy weights for patients.[105] On June 14, 2023, the AMA adopted a new policy clarifying how BMI should be used as a measure in medicine.[106] The AMA suggests that BMI be used in conjunction with other valid measures of risk such as, but not limited to, measurements of visceral fat, body adiposity index, body composition, relative fat mass, waist circumference and genetic/metabolic factors.[107]

---

[105] *Id.*
[106] AMA, *AMA adopts new policy clarifying role of BMI as a measure in medicine* (Jun. 14, 2023), available at https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policy-clarifying-role-bmi-measure-medicine.
[107] *Id.*

34

143.     Weight loss as the sole indicator of health has also been rejected by many clinicians in favor of improvements in other health outcomes and the assess the whole health of an individual.[108] These clinicians have cautioned that "a lower body weight does not always mean a person is healthier."[109] In many instances, when someone loses weight, they lose fat (a good result), but also lose muscle mass (bad).

144.     It is recognized in the medical community that weight loss achieved by Ozempic and Wegovy is often a result of a significant loss of muscle mass.[110] As a result, individuals may be lighter than they were initially but have a higher percentage of body fat.[111]

145.     To further exacerbate the problem, if patients stop taking a GLP-1 RA and regain weight, as discussed above, that weight gain is typically not adding muscle but instead adding fat. Therefore, the resulting "new you" is less healthy—weighing the same but having a higher percentage of body fat.

146.     The loss of too much muscle mass can lead to sarcopenia, a condition called being "skinny fat," in which the patient has decreased muscle mass, lessened bone density, and lower resting metabolic rate—all of which results in a loss of strength and functionality.[112]

---

[108] Hagan & Nelson, *Are Current Guidelines Perpetuating Weight Stigma? A Weight-Skeptical Approach to the Care of Patients with Obesity*, 38(3) J. GEN. INTERN. MED. 793–8 (Sept. 2022), available at https://link.springer.com/content/pdf/10.1007/s11606-022-07821-w.pdf?pdf=button; *Why body mass index doesn't give the whole health picture*, UW Medicine Newsroom (Jun. 20, 2023), available at https://newsroom.uw.edu/video-library/why-body-mass-index-doesnt-give-the-whole-health-picture.

[109] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

[110] K. Sullivan, *Weight loss drugs can lead to muscle loss, too. Is that a bad thing?*, NBC News (May 20, 2023), available at https://www.nbcnews.com/health/health-news/weight-loss-drugs-muscle-loss-rcna84936.

[111] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

[112] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

147. Lilly recognizes that much of the weight loss is actually healthy muscle tissue, but rather than warn consumers that most of the weight loss on tirzepatide will be muscle loss, Lilly has instead invested in developing combination drugs to combat the muscle loss.[113]

148. Defendants did not warn about the dangers of the type of unhealthy weight loss occurring with GLP-1 RAs. Novo personnel refer to weight loss resulting from Wegovy as a "healthy" weight loss.[114] At the same time, Novo told investors: "Healthy weight loss is, I don't want to call it the next frontier. But it is certainly important … There is a risk if you do introduce very fast and dramatic weight loss you will lose almost 50-50 lean body mass and fat mass. So the tempered but consistent body weight loss could potentially be healthier than a very dramatic fast weight loss."[115] Novo also stated that reasonable preservation of lean body mass "has to be a focus area, and you will probably see [it] in our pipeline."[116]

149. Similarly for Lilly, it was a "big investor question around [the] muscle issue"[117] and Lilly knew that "the quality of weight loss" mattered.[118] Lilly recognized that there could be some patients who "could benefit from both weight loss and maybe more muscle," hence why Lilly was investing in further research on products that would prevent muscle loss.[119]

150. Because Defendants do not warn of or disclose the type of weight loss occurring with GLP-1 RAs, patients do not factor that into their analysis of risks and benefits when

---

[113] Dani Blum, *The Race Is On to Stop Ozempic Muscle Loss*, NEW YORK TIMES (Feb. 8, 2024), available at https://www.nytimes.com/2024/02/08/well/live/ozempic-muscle-loss-exercise.html.
[114] A. Pawlowski, *Is it safe to take the anti-obesity drug Wegovy long-term? Doctors weigh in*, TODAY (Jan. 25, 2023), available at https://www.today.com/health/diet-fitness/is-wegovy-safe-for-weight-loss-rcna67277.
[115] *See* 2022-11-03 Q3 Earnings Call.
[116] *Id*.
[117] 20231128 Evercore ISI 6th Annual HealthCONx Conference.
[118] 2024430 Q1 2024 Earnings Call.
[119] 20231128 Evercore ISI 6th Annual HealthCONx Conference.

considering taking a GLP-1 RA and are not aware that they should take specific steps to mitigate this muscle loss, like dietary changes and strength training.[120]

### e. Many Patients Do Not Stay on the Drugs Long Enough to See Benefits

151.    Approximately 58% of patients stop taking a GLP-1 RA within 12 weeks, and 30 percent stop in the first 4 weeks. In May of 2024, Blue Cross Blue Shield published "Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management" noting these statistics.[121] This means that "[the] value [GLP-1 RA treatment] is not likely to be realized" in most patients.[122]

152.    This is perhaps caused by the fact that side effects are most likely to present themselves in the first 12 weeks of use as the dosage increases. Lilly itself has noted that the risks of the medicine are often seen within just 12 weeks of use as patients are escalating the dosage up.[123] Physicians also recognize that adverse events are also more likely to occur during dose escalation with Ozempic and Wegovy.[124]

153.    Neither Novo or Lilly warns or highlights that most people are unable to tolerate the drug and stay on it long enough for it to make a meaningful difference. These are clear indications that could impact a patient's decision to take a GLP-1 RA.

---

[120] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

[121] Blue Health Intelligence, *Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management*, Issue Brief (May 2024), available at https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf.

[122] Gleason et al., *Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes*, 30 JMCP 2 (2024).

[123] D. Ovalle et al., *Patients grapple with side effects of popular weight-loss drugs*, THE WASHINGTON POST (Aug. 8, 2023), available at https://www.washingtonpost.com/health/2023/08/08/weight-loss-drugs-side-effects-wegovy-ozempic/.

[124] Braxton Medical Clinic, *Understanding the Side Effects of Semaglutide and Tirzepatide* (Jun. 2, 2024), available at https://www.braxtonmedicalclinic.com/post/understanding-the-side-effects-of-semaglutide-and-tirzepatide-a-comprehensive-guide-for-patients-of.

154. Federal regulators have raised misleading promotional, marketing and advertising materials with Novo and Lilly (the OPDP's March 14, 2008 letter was previously discussed):

155. On September 23, 2021, Health and Human Services ("HHS") issued a response letter to Novo regarding Wegovy's misleading statements and that fact that it was minimizing the risk of nausea. [125]

156. In a June 1, 2015 letter to Lilly related to a proposed print advertisement, the OPDP remarked that Lilly "downplays the risk of nausea experienced in clinical trials."

157. In the same 2015 letter, the OPDP said that the promotional materials "misleadingly" implied that Trulicity was indicated for weight-loss and that patients would see substantial loss in weight. While these promotional materials did contain some language in small print that Trulicity was "not indicated for weight loss," the OPDP found that the inclusion of such disclosures did not "mitigate the overwhelmingly powerful weight loss claims and presentations conveyed in the proposed detailed aid."

158. A mere 3 months later, on September 16, 2014, the FDA wrote again, finding many significant issues related to Trulicity marketing. In addition to repeated comments about minimization of risk and overstatement of efficacy, this time the OPDP noted that Lilly's marketing materials were broadening the patient population for Trulicity. Indeed, the OPDP wrote that Lilly's marketing was "misleading because they suggest that Trulicity is useful in a broader range of patients or conditions than has been demonstrated by substantial evidence." In a January 30, 2018 letter to Lilly, the OPDP repeated its concerns about the "Net impression" of the Trulicity marketing, specifically regarding the prominence and readability of the small print text in the ads, and referring to letters from 2015, 2016 and 2017 as to this point.

---

[125] OPDP Letter, Sept. 23, 2021 (Novo_GLP_MDL_WEG_NDA_000531088).

159. A February 12, 2019 letter from OPDP to Lilly repeated the concern about the small print text at the bottom of the commercials.

160. In a December 17, 2020 letter to Lilly, the OPDP found that Lilly was creating a "misleading impression" that Trulicity was indicated for "weight loss."

161. Specifically, the OPDO found that Lilly was omitting information that patients were receiving additional medications during the trials which showed weight loss. The OPDO found that the "omission of this information undermines the ability of the viewer to understand and evaluate the efficacy claims presented in the proposed TV Ad."

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

162. Defendants are estopped from relying on the statute of limitations defense because Defendants actively concealed information concerning known risks, side effects, and defects in their GLP-1 RA Products. Instead of revealing such information to the FDA or the public, Defendants have continued to represent their GLP-1 RA Products as safe for their intended use.

163. Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with their GLP-1 RA Products. Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of their GLP-1 RA Products, Defendants are estopped from relying on any statute of limitations defense.

## FIRST CAUSE OF ACTION
## FAILURE TO WARN - NEGLIGENCE

164. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

165. Defendants, directly or indirectly, caused Saxenda to be sold, distributed, packaged, labeled, marketed, promoted, and used by Plaintiff. At all relevant times, Defendants registered, researched, distributed, marketed, overpromoted, and sold Saxenda within the State of Wyoming and throughout the United States.

166. At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Saxenda products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

167. At all relevant times, Defendants knew, or in the exercise of reasonable care, should have known of the hazards and dangers associated with Saxenda and, specifically, that use of this drug could cause NAION and its sequalae.

168. At all relevant times, Defendants knew, or in the exercise of reasonable care, should have known that there was reasonable evidence of a causal association with NAION and its sequalae, and that use of Saxenda could cause Plaintiff's injuries and, thus, created a dangerous and unreasonable risk of injury to Plaintiff and other users of this product for which Defendants did not warn.

169. Defendants knew or in the exercise of reasonable care should have known that users and consumers were unaware of the risks and magnitude of the risks associated with the use of Saxenda.

170. Defendants breached their duty of care to Plaintiff and Plaintiff's treating physicians, in the warning, testing, monitoring, and pharmacovigilance of Saxenda.

171. In disregard of its duties, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, marketing, formulating, creating, developing, designing, selling, and distributing Saxenda without thorough and adequate pre- and post-market testing of the product;

b. Manufacturing, producing, overpromoting, marketing, advertising, formulating, creating, developing, and distributing Saxenda and, upon information and belief, while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Saxenda;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Saxenda was safe for its intended use;

d. Upon information and belief, failing to disclose and warn of the product defect to the regulatory agencies, the medical community, and consumers that Defendant knew and had reason to know that Saxenda was indeed unreasonably unsafe and unfit for use by reason of the product's defect and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that Saxenda's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Saxenda;

g. Advertising, marketing, and recommending the use of Saxenda while concealing and failing to disclose or warn of the dangers known by Defendant to be connected with and inherent in the use of Saxenda;

h.      Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Saxenda so as to avoid the risk of serious harm associated with the use of Saxenda and failing to design and manufacture Saxenda so as to ensure the drug was at least as safe and effective as other similar products;

i.      Failing to ensure that Saxenda was accompanied by proper and accurate warnings about the increased risks of NAION and its sequale;

j.      Failing to ensure that Saxenda was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Saxenda and that use of Saxenda created a high risk of severe injuries; and

k.      Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Saxenda.

172.    A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

173.    As a direct and proximate result of Defendants' negligent testing, monitoring, and pharmacovigilance of Saxenda, Defendants introduced a drug into the State where Plaintiff resided and received healthcare treatment that they knew or should have known would cause serious and severe complications and debilitating injuries including NAION and its sequalae.

174.    The aforementioned negligence and wrongs done by Defendants were aggravated by the kind of grossly negligent conduct and disregard for the rights of others, the public, and Plaintiff, for which the law allows the imposition of exemplary or punitive damages, in that Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants proceeded with a reckless disregard to the rights, safety, or welfare of others, including Plaintiff.

175.    Defendants are liable in tort to Plaintiff for their wrongful conduct pursuant to applicable state law.

176.    As a direct and proximate result of one or more of the above-stated negligent acts by Defendants, Plaintiff suffered bodily injuries and consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## FAILURE TO WARN – STRICT LIABILITY

177.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

178.    Applicable state law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their products.

179.    At all times mentioned herein, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Saxenda that was used by Plaintiff.

180.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Saxenda into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as NAION and its sequalae.

43

181. Saxenda was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

182. At all relevant times, and at the times Saxenda left the Defendants' control, Defendants knew or should have known that Saxenda was and is unreasonably dangerous because Defendants did not adequately warn of the risks of NAION and its sequalae when used in the form and manner as provided by Defendants.

183. Despite the fact that Defendants knew or should have known that Saxenda caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Saxenda to consumers, including Plaintiff, without adequate warnings.

184. Despite the fact that Defendants knew or should have known that Saxenda caused unreasonably dangerous injuries, Defendants continued to market Saxenda to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

185. Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

186. At all relevant times, given its increased safety risks, Saxenda was not fit for the ordinary purpose for which it was intended— namely, as an adjunct to diet and exercise to improve weight management.

187. At all relevant times, given the increased safety risks, Saxenda did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

188. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or

distribution of Saxenda into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as NAION and its sequalae.

189.    At all relevant times, Plaintiff was using Saxenda for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to manage weight.

190.    The Saxenda product designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous injuries, including NAION and its sequalae which are permanent and lasting in nature and the Defendants failed to adequately warn of said risks.

191.    The Saxenda designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including NAION and its sequalae, as well as other severe and permanent health consequences from Saxenda, they failed to provide adequate warnings to users and/or prescribers of the product, and continued to improperly advertise, market and/or promote its product, Saxenda.

192.    The label for Saxenda was inadequate because it did not warn and/or adequately warn of all possible adverse side effects associated with the use of Saxenda, including the increased risk of NAION and its sequelae.

193.    The label for Saxenda was inadequate because it did not warn and/or adequately warn that Saxenda had not been sufficiently and/or adequately tested for safety risks, including the increased risk of NAION and its sequelae.

194.    The label for Saxenda was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Saxenda.

195.    The label for Saxenda was inadequate because it did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects.

196.    Communications made by Defendants to Plaintiff and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects associated with the use of Saxenda, including the increased risk of NAION and its sequelae.

197.    Communications made by Defendants to Plaintiff and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Saxenda had not been sufficiently and/or adequately tested for safety risks, including the increased risk of NAION and its sequelae.

198.    Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and her reliance upon Defendants' warnings was reasonable.

199.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and their reliance upon Defendants' warnings was reasonable.

200.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of NAION and its sequalae associated with Saxenda, they would not have prescribed Saxenda and/or would have provided Plaintiff with adequate warnings regarding the dangers of Saxenda so as to allow Plaintiff to make an informed decision regarding her use of Saxenda.

201.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Saxenda had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequalae, they would not have prescribed Saxenda and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Saxenda so as to allow Plaintiff to make an informed decision regarding her use of Saxenda.

202.    Had Plaintiff been warned of the increased risk of NAION and its sequelae and other severe symptoms, which are causally associated with Saxenda, she would not have used Saxenda and would not have suffered from NAION and its sequelae.

203.    Had Plaintiff been warned that Saxenda had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, she would not have used Saxenda or suffered from NAION and its sequelae.

204.    Had Plaintiff been warned of the increased risk of NAION and its sequelae and other severe symptoms, which are causally associated with Saxenda, she would have informed his prescribing physicians that she did not want to take Saxenda.

205.    Upon information and belief, if Plaintiff had informed her prescribing physician(s) that she did not want to take Saxenda, her prescribing physician(s) would not have prescribed Saxenda.

206.    By reason of the foregoing, Defendants have become liable to the Plaintiff for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous product –Saxenda.

207.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health

of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff in accordance with state law.

208. Defendants' inadequate warnings of Saxenda were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

209. Defendants' inadequate warnings of Saxenda were a substantial factor in causing Plaintiff's injuries.

210. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for surgical intervention, lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

211. As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that she will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY)

212. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

48

213. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Saxenda as hereinabove described that was used by Plaintiff.

214. At all relevant times, Defendants expressly warranted to Plaintiff and her prescribing physician(s) that Saxenda was safe as an adjunct to diet and exercise to manage weight loss.

215. At all relevant times, Defendants expressly warranted to Plaintiff and her prescribing physician(s) that Saxenda was effective to use as an adjunct to diet and exercise to manage weight loss.

216. At all relevant times, Defendants expressly warranted to Plaintiff and her prescribing physician(s) that the effectiveness of Saxenda outweighed any potential dangers and/or risks.

217. The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician(s) by way of Saxenda's labels, websites, advertisements, promotional materials, and through other statements.

218. As a result of Defendants' express warranties to her prescribing physician(s), they were induced to prescribe Saxenda to Plaintiff, and Plaintiff was induced to use Saxenda.

219. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as the Plaintiff, would use and/or consume Saxenda based upon their express warranties.

220. At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as the Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Saxenda based upon their express warranties.

221. At all relevant times, Defendants knew or should have known that Saxenda was unreasonably dangerous because of the drug's increased risk of NAION and its sequalae when the drugs were used in the form and manner as provided by Defendants.

222. At all relevant times, Defendants knew or should have known that Saxenda was unreasonably dangerous because the drug's safety risks outweighed any efficacy the drug may have.

223. At all relevant times, Defendants knew or should have known that Saxenda had not been sufficiently and/or adequately tested for safety.

224. The unreasonably dangerous characteristics of Saxenda were and are beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

225. The unreasonably dangerous characteristics of Saxenda were and are beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

226. At the time Saxenda left the Defendants' control, Saxenda did not conform to Defendants' express warranties because Saxenda was not safe to use as an adjunct to diet and exercise to manage weight loss, in that it was associated with an increased risk of NAION.

227. The express warranties made by Defendants regarding the safety and efficacy of Saxenda was made with the intent to induce Plaintiff to use the product and/or her prescribing physician(s) to prescribe the product.

228.     Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or her prescribing physician(s), it would be the natural tendency of Plaintiff to use Saxenda and/or the natural tendency of her prescribing physician(s) to prescribe Saxenda.

229.     Plaintiff and her prescribing physician(s), as well as members of the medical community, relied on the express warranties of the Defendants identified herein.

230.     Had Defendants not made these express warranties, Plaintiff would not have used Saxenda and/or, upon information and belief, her prescribing physician(s) would not have prescribed Saxenda.

231.     Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

232.     Plaintiff's injuries and damages arose from a reasonably anticipated use of the product by Plaintiff.

233.     Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

234.     As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequalae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for surgical intervention, lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

235.     By reason of the foregoing, Plaintiff has been severely and permanently injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Saxenda.

236. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that she will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

237. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive with the same force and effect as if more fully set forth herein.

238. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Saxenda drug used by Plaintiff.

239. Saxenda was expected to and did reach the usual consumers, handlers, and persons encountering said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

240. At all relevant times, Defendants impliedly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Saxenda was of merchantable quality and safe and fit for their ordinary purposes.

241. At all relevant times, Defendants knew or should have known that Saxenda was unreasonably dangerous because of its increased risk of NAION and its sequelae, especially when the drugs were used in the form and manner as provided by Defendants.

242.    At all relevant times, Defendants knew or should have known that Saxenda had not been sufficiently and/or adequately tested for safety. At the time Saxenda left Defendants' control, Saxenda did not conform to Defendants' implied warranty and was unfit for its ordinary purposes because Defendants failed to provide adequate warnings of the drug's causal association with increased risk of NAION and its sequelae.

243.    At the time Saxenda left Defendants' control, Saxenda did not conform to Defendants' implied warranty because Saxenda was an unreasonably dangerous product to use as an adjunct to diet and exercise to aid weight loss in adults with obesity or who are overweight and also have at least one weight- related comorbid condition, and children ages 12-17 with obesity and have a body weight above 132 pounds, in that they were causally associated with increased risks of NAION and its sequelae.

244.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physician(s), such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Saxenda for use by their patients to promote weight loss.

245.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Saxenda for its ordinary purposes.

246.    Despite the fact that Defendants knew or should have known that Saxenda caused unreasonably dangerous injuries, such as NAION and its sequelae, Defendants continued to market, distribute, and/or sell Saxenda to consumers, including Plaintiff, without adequate warnings. The unreasonably dangerous characteristics of Saxenda were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

247. The unreasonably dangerous characteristics of Saxenda were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drug's characteristics.

248. Plaintiff reasonably relied on Defendants' implied warranty of merchantability relating to Saxenda's safety and efficacy.

249. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Saxenda was of merchantable quality and safe and fit for its intended use.

250. Upon information and belief Plaintiff's prescribing physician(s) relied on Defendants' implied warranty of merchantability and fitness for the ordinary uses and purposes relating to Saxenda.

251. Upon information and belief Plaintiff's prescribing physician(s), reasonably relied upon the skill and judgment of Defendants as to whether Saxenda was of merchantable quality and safe and fit for its intended use.

252. Had Defendants not made these implied warranties, Plaintiff would not have used Saxenda and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Saxenda, and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Saxenda to allow Plaintiff to make an informed decision regarding Plaintiff's use of Saxenda. Defendants herein breached the aforesaid implied warranty of merchantability because the drug Saxenda was not fit for its intended purpose.

253. Defendants' breaches of implied warranty of merchantability were a substantial factor in causing Plaintiff's injuries.

254. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

255. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT/FRAUD BY OMISSION

256. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

257. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Saxenda, which was used by Plaintiff as hereinabove described.

258. At all relevant times, Defendants knew or should have known that Saxenda had not been adequately and/or sufficiently tested for safety.

259. At all relevant times, Defendants knew or should have known that Saxenda was unreasonably dangerous because of the increased risk of NAION and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

260.     Defendants had a duty to disclose material information about Saxenda to Plaintiff and Plaintiff's prescribing physician(s), namely that Saxenda is causally associated with increased risk of NAION and its sequelae, because Defendants have superior knowledge of the drug and its dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician(s) by reasonable inquiry, and Defendants knew or should have known that Plaintiff and Plaintiff's prescribing physician would act on the basis of mistaken knowledge.

261.     Nonetheless, Defendants consciously and deliberately withheld and concealed from Plaintiff's prescribing physician(s), Plaintiff, the medical and healthcare community, and the general public this material information.

262.     Defendants' promotional websites for Saxenda do not disclose that there is reasonable evidence of a causal association between Saxenda and increased risk of NAION and its sequelae.

263.     Defendants' omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Saxenda to promote weight loss.

264.     Defendants knew or should have known that Plaintiff's prescribing physician(s) would prescribe and Plaintiff would use Saxenda without the awareness of the risks of serious side effects, including NAION and its sequelae.

265.     Defendants knew that Plaintiff and Plaintiff's prescribing physicians (s) had no way to uncover the concealed information and determine the truth surrounding Saxenda, as set forth herein.

266.    Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material omissions when making the decision to dispense, provide, and prescribe Saxenda.

267.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of NAION and its sequelae causally associated with Saxenda, they would not have prescribed Saxenda and/or would have provided Plaintiff with adequate information regarding the increased risk of NAION and its sequelae causally associated with Saxenda to allow Plaintiff to make an informed decision regarding Plaintiff's use of Saxenda.

268.    Upon information and belief, had Plaintiff's prescribing physician(s) been told that Saxenda had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, they would not have prescribed Saxenda and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Saxenda to allow Plaintiff to make an informed decision regarding Plaintiff's use of Saxenda.

269.    Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Saxenda.

270.    Had Plaintiff been informed of the increased risks causally associated with Saxenda, Plaintiff would not have used Saxenda and/or suffered NAION and its sequelae.

271.    Defendants' fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

272.    Plaintiff intends to plead all claims of product liability that are supported by their factual allegations and that exist under the statutes and common law of the state or states applicable to their claims, including any applicable state Product Liability Act.

273. As a direct and proximate result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries, including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

274. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
**FRAUDULENT / INTENTIONAL MISREPRESENTATON**

275. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

276. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Saxenda, which was used by Plaintiff as hereinabove described.

277. At all relevant times, Defendants knew or should have known that Saxenda had not been adequately and/or sufficiently tested for safety.

278. At all relevant times, Defendants knew or should have known of the serious side effects of Saxenda, including NAION and its sequelae.

279.    At all relevant times, Defendants knew or should have known that Saxenda was not safe to promote weight loss, given its increased risk of NAION and its sequelae.

280.    Nonetheless, Defendants made material misrepresentations to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Saxenda.

281.    Defendants represented affirmatively and by omission on television advertisements, social media and other online advertisements, and on the labels of Saxenda that Saxenda was a safe and effective drug for treatment of adults for chronic weight management, despite being aware of increased risks of NAION and its sequelae causally associated with using Saxenda.

282.    Defendants were aware or should have been aware that their representations were false or misleading, and knew that they were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public.

283.    Defendants' misrepresentations of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Saxenda to promote weight loss.

284.    Upon information and belief, Plaintiff's prescribing physician(s) had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Saxenda, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts in which Plaintiff's prescribing physician(s) had no way to know were omitted.

59

285. Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Saxenda to Plaintiff.

286. Upon information and belief, had Plaintiff's prescribing physician(s) been informed of the increased risk of NAION and its sequelae causally associated with Saxenda, Plaintiff's prescribing physician(s) would not have prescribed Saxenda and/or would have provided Plaintiff with adequate information regarding safety of Saxenda to allow Plaintiff to make an informed decision regarding Plaintiff's use of Saxenda.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

<u>**SEVENTH CAUSE OF ACTION**</u>
<u>**NEGLIGENT MISREPRESENTATION AND MARKETING**</u>

287. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

288. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, the general medical community, and the public with false, fraudulent, and/or incorrect information or omitted or failed to disclose material information concerning Saxenda, including, but not limited to, misrepresentations and marketing regarding the safety and known risks of Saxenda.

289. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, the general medical community, and the public with false, fraudulent, and/or incorrect information or omitted or failed to disclose material information concerning Saxenda,

including, but not limited to, misrepresentations and marketing regarding the long-term effects of Saxenda.

290.    The information distributed by Defendants to the public, the medical community, Plaintiff and his healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, and marketing was false and misleading and contained omissions and concealment of truth about the dangers of Saxenda.

291.    Defendants' conduct had the capacity to deceive and/or its purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Saxenda and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Saxenda.

292.    Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, medical pharmaceutical manufacturers, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Saxenda, including NAION and its sequalae.

293.    Defendants made continued omissions in the Saxenda labeling, including promoting it as safe and effective while failing to warn of its propensity to cause NAION and its sequalae.

294.    Defendants made additional misrepresentations beyond the product labeling by representing Saxenda as a safe and effective treatment for weight loss with only minimal risks.

295.    Defendants misrepresented and overstated the benefits of Saxenda to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to patients.

296. Defendants made the misrepresentations alleged herein with the intent to induce consumers, like Plaintiff, to take their diabetes treatment product.

297. In reliance upon the false, deceptive and negligent misrepresentations and omissions and marketing made by Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use and prescribe Saxenda, and relied upon the affirmative misrepresentations and/or negligent omissions in doing so.

298. As a direct and proximate result of the foregoing negligent misrepresentations and marketing and conduct with capacity to deceive and/or intention to deceive, Plaintiff suffered serious and ongoing injuries.

299. As a direct and proximate result of the foregoing misrepresentations, marketing, and deceitful intentions, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

300. Defendants knew or should have known that Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true material facts which were intentionally and/or negligently concealed and misrepresented by Defendants.

301. Plaintiff and her healthcare providers would not have used or prescribed Saxenda had the true facts not been concealed by Defendants.

302. Defendants had sole access to many of the material facts concerning the defective nature of Saxenda and its propensity to cause serious and dangerous side effects.

303. At the time Plaintiff was prescribed and administered Saxenda, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

304. Defendants failed to exercise ordinary care in making representations concerning Saxenda while they were involved in the manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because Defendants negligently misrepresented Saxenda's high risk of unreasonable and dangerous adverse side effects.

305. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by Defendants, where they concealed and misrepresented facts that were critical to understanding the true and full dangers inherent in the use of the Saxenda.

306. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## STRICT PRODUCT LIABILITY MISREPRESENTATION / MARKETING

307. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

308. State law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when marketing, promoting, distributing, and selling their products.

309. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Saxenda which was used by Plaintiff as hereinabove described.

63

310. Defendants made material misrepresentations to Plaintiff, Plaintiff's prescribing physicians, the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Saxenda.

311. Defendants represented affirmatively and by omission on advertisements and on the labels of Saxenda that Saxenda was a safe and effective drug to aid in chronic weight management, and to reduce cardiac risk, despite the increased risks of NAION and its sequelae causally associated with using Saxenda.

312. Defendants' representations were false or misleading and/or concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physicians, the medical and healthcare community, and the general public.

313. Plaintiff and Plaintiff's prescribing physicians had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Saxenda, as set forth herein.

314. Upon information and belief, Plaintiff's prescribing physicians justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Defendants' Saxenda to Plaintiff.

315. Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased risks of NAION and its sequelae causally associated with Saxenda, Plaintiff's prescribing physicians would not have prescribed Saxenda and/or would have provided Plaintiff with adequate information regarding safety of Saxenda to allow Plaintiff to make an informed decision regarding Plaintiff's use of Saxenda.

316. Upon information and belief, had Plaintiff's prescribing physicians been told that Saxenda had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, they would not have prescribed Saxenda and/or would have provided Plaintiff with

adequate warnings regarding the lack of sufficient and/or adequate testing of Saxenda so that Plaintiff could make an informed decision regarding their use of Saxenda.

317. Plaintiff reasonably relied on the false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts which Plaintiff had no way to know were omitted.

318. Had Plaintiff been told of the increased risks of NAION and its sequelae causally associated with Saxenda, Plaintiff would not have used Saxenda and/or suffered from NAION and its sequelae.

319. As a direct and proximate result of one or more the foregoing false representations and/or omissions, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

320. As a direct and proximate result of one or more of the foregoing false representations and/or omissions, Plaintiff had also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that she will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## NEGLIGENCE

321.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

322.    Defendants, directly or indirectly, caused Saxenda to be sold, distributed, packaged, labeled, marketed, promoted, and used by Plaintiff. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, overpromoted, and sold Saxenda throughout the United States.

323.    At all relevant times, Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, labeling, sale and/or distribution of Saxenda, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

324.    At all relevant times, Defendants knew, or in the exercise of reasonable care, should have known of the hazards and dangers associated with Saxenda and, specifically, that use of this drug could cause NAION and its sequelae.

325.    At all relevant times, Defendants knew, or in the exercise of reasonable care, should have known that there was reasonable evidence of a causal association with NAION and its sequelae, and that the use of Saxenda could cause Plaintiff's injuries and, thus, created a dangerous and unreasonable risk of injury to the users of this product that Defendants did not warn of.

326.    Defendants knew, or in the exercise of reasonable care, should have known that users and consumers were unaware of the risks and magnitude of the risks associated with the use of Saxenda.

327.    Defendants breached their duty of care to Plaintiff and Plaintiff's treating physicians, in the warning, testing, monitoring, and pharmacovigilance of Saxenda.

328.    In disregard of their duties, Defendants committed one or more of the following negligent acts or omissions:

a.    Manufacturing, producing, overpromoting, marketing, formulating, creating, developing, designing, selling, and distributing Saxenda, without thorough and adequate pre- and post-market testing of the products;

b.    Manufacturing, producing, overpromoting, marketing, advertising, formulating, creating, developing, and distributing Saxenda, and upon information and belief, while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risks of serious harm associated with the use of Saxenda;

c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Saxenda were safe for their intended uses;

d.    Upon information and belief, failing to disclose and warn of the products' defects to the regulatory agencies, the medical community, and consumers that Defendants knew and had reason to know that Saxenda were indeed unreasonably unsafe and unfit for use by reason of the product's defects and risks of harm to its users;

e.    Failing to warn Plaintiff, the medical and healthcare community, and consumers that Saxenda's risks of harm were unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Saxenda;

67

g.      Advertising, marketing, and recommending the use of Saxenda, while concealing and failing to disclose or warn of the dangers Defendants knew or should have known to be connected with, and inherent in, the use of Saxenda;

h.      Representing that Saxenda was safe for weight management when in fact Defendants knew and/or should have known the products were not safe for those purposes;

i.      Continuing to manufacture and sell Saxenda with the knowledge that Saxenda, when used for weight management, were unreasonably unsafe and dangerous;

j.      Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Saxenda so as to avoid the risks of serious harm associated with the use of Saxenda. Failing to design and manufacture Saxenda so as to ensure the drug was at least as safe and effective as other similar products;

k.      Failing to ensure that Saxenda were accompanied by proper and accurate warnings about the increased risks of NAION and its sequelae;

l.      Failing to ensure that Saxenda were accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Saxenda and that use of Saxenda created a high risk of severe and debilitating injuries; and

m.      Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Saxenda.

329.    A reasonable manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

330.    As a direct and proximate result of Defendants' negligent testing, monitoring, and pharmacovigilance of Saxenda, Defendants introduced a drug into the State of Wyomng which

they knew or should have known would cause serious, severe and debilitating injuries, including NAION and its sequelae.

331.    The aforementioned negligence and wrongs done by Defendants were aggravated by the kind of grossly negligent conduct and disregard for the rights of others, the public, and Plaintiff, for which the law allows the imposition of exemplary or punitive damages, in that Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants proceeded with a reckless disregard to the rights, safety, and welfare of others, including Plaintiff.

332.    Defendants are liable in tort to Plaintiff for their wrongful conduct pursuant to applicable state law.

333.    As a direct or proximate result of one or more of the foregoing negligent acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

334.    As a direct and proximate result of one or more of the foregoing negligent acts and omissions by Defendants, Plaintiff suffered bodily injuries and consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**TENTH CAUSE OF ACTION**
**NEGLIGENT UNDERTAKING**

335.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

336.    Numerous state laws recognize liability related to the voluntary assumption of a duty or undertaking. This includes the voluntary undertaking of targeting patients with direct-to-consumer ("DTC") marketing campaigns.

337.    Defendants voluntarily undertook the responsibility to market Saxenda directly to the consumer instead of solely to physicians and other health care providers. In choosing to target the ordinary consumer with their DTC marketing campaigns, the Defendants undertook the responsibility to do so in a truthful and non-misleading manner and to adequately warn of the risks of their product. Having undertaken the responsibility, Defendants are required to do so with reasonable care.

338.    Courts have recognized that DTC advertising "provides the consumer with a diluted variation of risks associated with the drug product" and "[c]onsumers often interpret such warnings as a 'general reassurance' that their condition can be treated," rather than an awareness of risks. *See, e.g, Perez v. Wyeth Lab'ys Inc*., 161 N.J. 1, 14, 734 A.2d 1245, 1253 (1999).

339.    The FDA requires pharmaceutical promotional materials to be truthful and non-misleading and that they comply with applicable statutory and regulatory requirements. The FDA looks not just at specific risk-related statements, but at the net impression of promotional materials.

340.    Common law requires a company to act with reasonable care when they assume a duty to the consumer.

341.    As alleged above, Defendants failed to warn consumers in their DTC advertisements about the true nature and extent of the risks associated with Saxenda. This includes

70

warnings as to the possibility of developing NAION and its sequelae, and the true efficacy of the drugs – primarily that most patients stop taking the drug and regain any weight that was lost. Only a small percentage of patients ever reach a normal BMI on weight loss drugs.

342. Instead, Defendants advertisements promoted happy images of individuals stating they would "lose weight and keep it off." This DTC campaign amassed over 13 million impressions in the first 3 days after launch.

343. Novo does not disclose the need to remain on its weight loss drugs forever in order to maintain weight loss in its direct-to-consumer marketing campaigns. Nor does Novo disclose that everyone is at risk of regaining all the weight back within five years.

344. If this information had been disclosed to Plaintiff, then she would not have sought a prescription for Saxenda.

345. As a direct and proximate result of Defendant's breach of duty of care, Plaintiff suffered mental and physical injuries from taking Saxenda.

346. Defendants are liable in tort to Plaintiff for their wrongful conduct pursuant to applicable state law.

347. As a direct and proximate result of these negligent acts and omissions by Defendants, Plaintiff suffered bodily injuries and consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

71

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants on each of the above referenced claims and Causes of Action and as follows:

1.      Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.      Awarding Plaintiff the costs of these proceedings; and

4.      Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Dated: July 23, 2026                          RESPECTFULLY SUBMITTED,


                                              */s/ Sarah S. Ruane*
                                              Sarah S. Ruane (*Admitted Pro Hac Vice)*
                                              WAGSTAFF & CARTMELL LLP
                                              4740 Grand Ave., Ste 300
                                              Kansas City, MO 64112
                                              Tel: 816-701-1100
                                              Fax: 816-531-2372
                                              sruane@wcllp.com

                                              **Attorneys for Plaintiff**